IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | No. 20 CR 298 |
| | ) | |
| Khiry Jackson, | ) | |
| | ) | |
| Defendant. | ) | |

<u>Memorandum Opinion and Order</u>

Khiry Jackson was arrested on October 14, 2019, after fleeing from Chicago Police Officers and leading them on a foot chase through a residential neighborhood, where the arresting officer saw him toss a firearm into a neighboring yard. At the time of his arrest, Mr. Jackson knew that his criminal record included at least two felony drug convictions punishable by a term of incarceration exceeding one year. Accordingly, he was prohibited from possessing a firearm under § 922(g)(1). The Cook County State's Attorney's office charged Mr. Jackson with being an Armed Habitual Criminal and seven additional felony firearms charges, and he was detained on a parole violation. A federal grand jury later charged Mr. Jackson with the § 922(g)(1) offense at issue in

1

this action, and he was placed in federal custody where he remains to this day.

After I denied Mr. Jackson's motion to quash his arrest and suppress evidence, *see generally*, *United States v. Jackson*, --- F.Supp.3d ----, 2023 WL 2572427 (N.D. Ill. Mar. 20, 2023), he pled guilty to being a felon in possession of a firearm. Mr. Jackson now moves to withdraw his guilty plea and dismiss the indictment, however, on the ground that 18 U.S.C. § 922(g)(1) violates the Second Amendment pursuant to *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). For the reasons explained below, I deny the motion.

I.

The Second Amendment provides: "A well regulated militia, being essential to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court identified the "core" of the Second Amendment as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. 570, 634-35 (2008), and held that a law that "totally ban[ned] handgun possession in the home" was unconstitutional, *id.* at 628. The Court recognized, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. In particular, *Heller* stated that "nothing in our opinion should be taken to cast doubt on

2

longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626–27.

In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court extended *Heller* to state and local governments through the Fourteenth Amendment; reiterated that the right protected by the Second Amendment was not unlimited; and reaffirmed that its holding in *Heller* did not cast doubt on longstanding firearm restrictions, including those that prohibit the possession of firearms by felons. *Id*. at 786. Distilled to their essence, *Heller* and *McDonald* "established that the Second Amendment 'protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home,'" *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) (quoting *McDonald*, 561 U.S. at 780), while acknowledging that that right can appropriately be subject to regulation so long as the regulation "comport[s] with history and tradition." *Bruen*, 142 S. Ct. at 2128.

In the years following *Heller* and *McDonald*, many courts of appeals, including the Seventh Circuit, developed a two-step test for evaluating Second Amendment challenges. *See,* e.g., *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019), *abrogated by Bruen*, 142 S. Ct. 2111 (2022). The threshold question in this framework was

"whether the regulated activity falls within the scope of the Second Amendment." *Id.* at 441. Then, "if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected," courts conducted "a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* (citations omitted).

In *Bruen*, however, the Court held that this two-step approach to applying *Heller* was "one step too many." 142 S. Ct. at 2127 (2022). Properly construed, the *Bruen* majority held, *Heller* eschews the use of any "means-end test such as strict or intermediate scrutiny" in the Second Amendment context, *id.* at 2129.[1] Accordingly, it established a new framework that "reflects the majority's view that the basic right to bear arms could not be dependent on legislative or judicial sufferance." *United States v. Watson*, No. 23-CR-109, 2023 WL 6623774, at *2 (E.D. Wis. Oct. 11, 2023).

The *Bruen* analysis begins by asking if the Second Amendment's plain text covers an individual's conduct. If so, the conduct is "presumptively protect[ed]," and "[t]he government must then justify its regulation" of that conduct "by demonstrating that it is consistent with the Nation's historical tradition of firearm

---

[1] *But see id.* at 2175 (Breyer, J., dissenting) (viewing *Heller* as rejecting "a free-standing 'interest-balancing' approach" but implicitly endorsing the use of traditional means-end scrutiny).

regulation." *Bruen*, 142 S. Ct. at 2129–30. This means that courts weighing Second Amendment challenges must conduct a historical inquiry into analogous laws of the past to determine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. To establish that a given law withstands such a challenge, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphases in original).

## II.

*Bruen* prompted "a flurry of filings across the country challenging various firearms regulations," including challenges to § 922(g)(1). *United States of Am. v. Reggie Johnson*, No. 18 CR 00458, 2023 WL 6690388, at *2 (N.D. Ill. Oct. 12, 2023) (Durkin, J.). As the government observes, nearly every federal court to have considered such challenges—including several in this district—has concluded that § 922(g)(1) remains constitutional after *Bruen*.[2] While there is no binding precedent on whether the

---

[2] The government's response to Mr. Jackson's motion includes an appendix listing 192 cases it had collected by the time of filing. The number is growing: Since the government filed its brief, several judges in this district have issued additional decisions holding that § 922(g)(1) is constitutional under *Bruen*. *See United States v. Hardy*, No. 23 CR 129, 2023 WL 6795591, at *2 (N.D. Ill. Oct. 13, 2023) (Kendall, J.); *United States v. Reggie Johnson*, No. 18 CR 00458, 2023 WL 6690388, at *2 (N.D. Ill. Oct. 12, 2023) (Durkin, J.); *United States v. Agee*, No. 1:21-CR-00350-1, 2023 WL 6443924, at *2 (N.D. Ill. Oct. 3, 2023) (Chang, J.); *United States*

Second Amendment's plain text covers convicted felons' possession of firearms, some courts have relied on the Supreme Court's emphasis in *Heller*, *McDonald*, and *Bruen* that the "people" whose rights the Second Amendment protects are "ordinary, law-abiding" citizens—coupled with the Court's repeated assurances that these decisions did not call into question "longstanding prohibitions on the possession of firearms by felons"—to hold that the activity § 922(g)(1) regulates—firearms possession by felons—is outside the textual scope of the Second Amendment. *See, e.g., United States v. Hardy*, No. 23 CR 129, 2023 WL 6795591, at *2 (N.D. Ill. Oct. 13, 2023) (Kendall, J.) ("[t]he 'people' of the Second Amendment are not dangerous felons, so the restriction of their rights to bear arms is not an infringement on the Constitution."); *United States v. Crawford*, No. 2:20-CR-084-PPS-APR, 2023 WL 5559031, at *3 (N.D. Ind. Aug. 29, 2023) (Simon, J.) ("[i]n my way of thinking, convicted felons by definition are not "law abiding citizens." As a consequence, they are not protected by the Second Amendment."); *United States v. Braster*, No. 1:20-CR-66-HAB, 2023 WL 2346282, at

---

*v. Xavier Johnson*, No. 23 CR 156, 2023 WL 6276562, at *3 (N.D. Ill. Sept. 26, 2023) (Kendall, J.); and *United States v. Gates*, No. 1:22-CR-00397-1, 2023 WL 5748362, at *9 (N.D. Ill. Sept. 6, 2023) (Chang, J.). Other district courts within the Seventh Circuit have reached the same conclusion during this period. *See United States v. Keosackdy*, No. 3:22-CR-78 JD, 2023 WL 6805893, at *1 (N.D. Ind. Oct. 16, 2023); *United States v. Watson*, No. 23-CR-109, 2023 WL 6623774, at *1 (E.D. Wis. Oct. 11, 2023); *United States v. Crawford*, No. 2:20-CR-084-PPS-APR, 2023 WL 5559031, at *3 (N.D. Ind. Aug. 29, 2023).

*2 (N.D. Ind. Mar. 2, 2023) (Brady, J.) (no need to examine "whether felon-in-possession statutes have sufficient grounding in historical tradition to withstand a *Bruen* challenge" because "felons are excluded from the protection of the Second Amendment"); *United States v. Price*, --- F.Supp.3d ----, 2023 WL 1970251, at *4 (N.D. Ill. Feb. 13, 2023) (Kennelly, J.) (same).

Other courts have assumed that felons are covered by the Second Amendment's plain text but have upheld § 922(g)(1) based on the conclusion that the historical record establishes Congress's authority to prohibit this class from possessing firearms. *See, e.g., Johnson*, 2023 WL 6690388, at *4 (textual analysis is "not dispositive," but § 922(g)(1) "falls comfortably within the Nation's historical tradition of disarming categories of people considered to be dangerous"); *United States v. Rice*, No. 3:22-CR-36 JD, 2023 WL 2560836, at *8 (N.D. Ind. Mar. 17, 2023) (DeGuilio, J.) (assuming without deciding that Second Amendment's plain text covered the defendant's conduct, but the historical analysis establishes constitutionality of § 922(g)(1)). Still other courts have held affirmatively that convicted felons *do* fall within the textual scope of the Second Amendment but that historical analogues to § 922(g)(1) "evince a solid pattern of dispossessing groups of persons deemed to be legally disobedient (or at risk of being so)." *United States v. Agee*, No. 1:21-CR-00350-1, 2023 WL 6443924, at *5 (N.D. Ill. Oct. 3, 2023) (Chang. J.) (concluding

that there is "no reason to think that the word 'people' does not cover, on its face, all persons—including a person convicted of a felony," but upholding § 922(g)(1) because "the felon dispossession statute is part of this country's historical tradition of firearm regulation"); *United States v. Gates*, 2023 WL 5748362, at *1-9 (N.D. Ill. Sept. 6, 2023) (Chang, J.) (same).

In *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023), a panel majority of the Seventh Circuit vacated and remanded the district court's pre-*Bruen* decision dismissing the Second Amendment challenge of a defendant disqualified from firearms possession based on his 1998 guilty plea to felony mail fraud. *Id.* at 1021-22. The majority held that although the lower court had "faithfully applied" its pre-*Bruen* precedent, the parties' appellate submissions "only scratche[d] the surface of the historical analysis now required by *Bruen*." *Id.* at 1020. Accordingly, it remanded to the district court to conduct "a proper, fulsome analysis of the historical tradition supporting" § 922(g)(1). *Id.* at 1022. *But see id.* at 1025 (Wood, J., dissenting) (constitutionality of § 922(g)(1) under *Bruen* is a "pure question of law" that the appellate court can decide in the government's favor "without saddling [the district court] with a Ph.D.-level historical inquiry that necessarily will be inconclusive"). *Atkinson* thus did not resolve the constitutionality of § 922(g)(1), but it identified several

8

avenues of inquiry to "help focus the proper analysis." *Id*. at 1023.

Meanwhile, two Courts of Appeals have answered the substantive question squarely, and they have split.[3] In *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), the Eighth Circuit held § 922(g)(1) constitutional as applied to a defendant who—like the Mr. Jackson before me—had been convicted of state law drug felonies. The *Jackson* court found support for Congress's authority to enact § 922(g)(1) in early American laws that "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property." *Id*. at 503. On the nation's tradition of categorical firearms restrictions, the court pointed to English laws from the 1600s

---

[3] In addition to the Third and Eighth Circuit cases discussed below, the Tenth Circuit and the Fifth Circuit have also weighed in on whether § 922(g)(1) is constitutional in light of Bruen. Both courts upheld the statute, though they did so in cases whose procedural posture required something less than de novo review. *See, e.g., Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023) (because "*Bruen* did not indisputably and pellucidly abrogate our precedential opinion in [*United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009)]," which governed the defendant's case, and which "squarely upheld the constitutionality of the ban on felons' possession of firearms," the defendant's *Bruen* claim failed); *United States v. Racliff*, No. 22-10409, 2023 WL 5972049, at *1 (5th Cir. Sept. 14, 2023) (reviewing appellant's challenge to § 922(g)(1) "only for plain error" and concluding that his claim failed under that standard).

that "disarmed non-Anglican Protestants who refused to participate in the Church of England"; later laws prohibiting firearms ownership by "Catholics who refused to renounce their faith"; and colonial American laws restricting Native Americans, religious minorities, and "people who refused to declare an oath of loyalty" from gun ownership. *Id*. at 502-03. Based on this historical record, the court concluded that "legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people to an orderly society and compliance with its legal norms, not merely to address a person's demonstrated propensity for violence." *Id*. at 503 (internal quotation marks and citation omitted). Accordingly, the court rejected the defendant's argument that "§ 922(g)(1) was unconstitutional as applied to him because his drug offenses were 'non-violent' and do not show that he is more dangerous than the typical law-abiding citizen." *Id*. at 501.

Days later, the Third Circuit held in *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101-02 (3d Cir. 2023) (en banc), that § 922(g)(1) was unconstitutional as applied to an individual disqualified from gun ownership based on a decades-old conviction for making a false statement to obtain food-stamps—a crime classified by the state as a misdemeanor but punishable by up to five years in prison. The court began by rejecting the Government's text-based argument that "only 'law-abiding,

responsible citizens' are counted among 'the people' protected by the Second Amendment." *Id*. at 103. The court explained that the phrase "law-abiding, responsible citizens"—however often repeated in *Heller*, *McDonald*, and *Bruen*—should not be "overread" to exclude felons, as a class, from "the people" covered by the Second Amendment, first because the criminal histories of the plaintiffs in those cases were not at issue, and second because such an interpretation would give "the people" different meanings in different constitutional contexts. Additionally, the court found the phrase too "expansive and vague" to be applied consistently. *Id*. at 101-102. In this connection, the court expressed confidence "that the Supreme Court's references to 'law-abiding, responsible citizens' do not mean that every American who gets a traffic ticket is no longer among 'the people' protected by the Second Amendment," and observed that "Americans have widely divergent ideas about what is required for one to be considered a 'responsible' citizen." *Id*. at 102. In the end, the court concluded that to hold "that only 'law-abiding, responsible citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people.'" *Id*.

*Range* went on to reject the government's argument that the severe punishments meted out by early American governments for even non-violent offenses such as forgery and horse theft (both of which were capital crimes under federal and state laws

11

respectively) supported the "lifetime disarmament" of felons. *Id*. at 105. The court reasoned that such laws were not "relevantly similar" to § 922(g)(1), because "the greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id*. Accordingly, the court concluded that the government had failed to carry its burden of showing "that the Nation's historical tradition of firearms regulation supports depriving Range of his Second Amendment right to possess a firearm." But as the court emphasized in the very next sentence, "[o]ur decision today is a narrow one" in that it held § 922(g)(1) unconstitutional "only as applied to [Range] given his violation of 62 Pa. Stat. Ann. § 481(a)." *Id*. at 106.

And indeed, no federal court in the Seventh Circuit has followed *Range*, while several have distinguished or departed from it. For example, in *United States v. Hardy*, the court questioned *Range*'s assessment of the phrase "responsible, law-abiding citizens" as too expansive and vague to articulate a meaningful boundary on the scope of the Second Amendment, noting that *Heller* "cabined" the phrase by reference to "longstanding prohibitions on the possession of firearms by felons and the mentally ill." 2023 WL 6795591, at *3 (quoting *Heller*, 554 U.S. at 626). Observing that the *Range* court took pains to emphasize the narrowness of its

12

holding, *Hardy* concluded that even assuming some offenses are so petty that committing them does not inexorably place the offender permanently outside the class of "responsible, law-abiding citizens," that argument did not avail Mr. Hardy, whose "numerous felony convictions, including for manufacturing and distributing a controlled substance," placed him "squarely within the definition of a dangerous, habitual criminal who should not be able to possess a firearm." *Id.* (citing, *inter alia, United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) ("Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people.")).[4] *See also United States v. Reggie Johnson*, No. 18 CR 00458, 2023 WL 6690388, at *2 (N.D. Ill. Oct. 12, 2023) (calling *Range* an "outlier[]" and emphasizing the explicit narrowness of its holding); *United States v. Xavier Johnson*, No. 23 CR 156, 2023 WL 6276562, at *2 (N.D. Ill. Sept. 26, 2023) (finding *Range*'s reasoning unpersuasive "because its

---

[4] The *Hardy* court also was not persuaded by the *Range* majority's view that excluding felons from the textual scope of "the people" would create an unacceptable inconsistency with how that term is understood for purposes of other constitutional provisions, noting that felons forfeit constitutional rights such as the right to vote, the right to hold office, and the right to serve on a jury. *Hardy*, 2023 WL 6795591, at *4. But as explained in a later section, all of these rights are civic rights, and *Heller* holds that the Second Amendment's right to bear arms is an *individual* right, not a collective or civic right. Accordingly, I agree with the *Range* court's view that "the people" of the Second Amendment to have the same meaning as "the people" of the First and Fourth Amendment.

holding was narrowly crafted to specifically address whether the plaintiff, a non-violent felon, was protected by the Second Amendment as opposed to a violent felon."); *United States v. Wade*, No. 3:22-CR-3 JD, 2023 WL 6037404, at *2 (N.D. Ind. Sept. 15, 2023) (holding that *Range* "is inapplicable to Mr. Wade as he has prior convictions for violent felonies").

### III.

Prior to the instant case, Mr. Jackson pled guilty to two state drug offenses involving the manufacture, possession, and/or delivery of heroin and crack cocaine, and he was sentenced to three years of prison on these charges. His criminal history also includes additional drug crimes, robbery, and resisting a police officer, among other offenses.[5] Mr. Jackson argues that § 922(g)(1) is unconstitutional as applied to him because the government has not shown that felons are outside the textual scope of "the people" whose rights are protected by the Second Amendment, and that "there is no historical tradition of permanently disarming

---

[5] The Probation Office's sentencing recommendation, which was provided to Mr. Jackson for his review, summarizes Mr. Jackson's criminal history as follows: "[T]he defendant's known criminal history starts with an arrest at the age of 15 and includes property offenses, violent crimes, and numerous drug charges." ECF 92 at 2. The Presentence Investigation Report also notes that Mr. Jackson received a "major incident report" for assault while in the custody of the Illinois Department of Corrections, and that a plenary order of protection was issued against Mr. Jackson on the petition of Lonnie Bell, Jr., who is Mr. Jackson's stepfather. ECF 91 at 14.

felons *like Mr. Jackson*" (emphasis added).[6] The government contends that § 922(g)(1) is constitutional under both prongs of *Bruen*'s "text and history" analysis.

As noted above, there is no binding precedent in this circuit on whether the Second Amendment's plain text covers the possession of firearms by felons. The government's view that felons are outside the textual purview of "the people" rests heavily on the Supreme Court's "oft-quoted dicta describing felon-in-possession laws as 'presumptively lawful.'" *Atkinson* 70 F.4th at 1022 (7th Cir. 2023) (quoting *Heller*, 554 U.S. at 626–27 & n.26, and citing *McDonald*, 561 U.S. at 786 (plurality). But like the *Range* majority, the Seventh Circuit has observed that these references "did not reflect an attempt to define the term 'people,'" and thus declined "to place more weight on these passing references than the Court itself did." *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015). *Atkinson* confirms that in this circuit, something more than the Supreme Court's statements in *Heller*, *McDonald*, and *Bruen* is needed to establish the meaning of "the people" in the Second Amendment.

In this connection, the government first offers Thomas M. Cooley's work, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American

---

[6] Mr. Jackson does not say what particular subgroup of felons he is "like." But given the nature and extent of his criminal history, nothing turns on this detail.

Union (1868) ("Cooley"). Cooley asks: "Who are the people in whom is vested the sovereignty of the State? – since it is evident that they cannot include the whole population... ." *Id*. at 28. "As a practical fact, the sovereignty is vested in those persons who by the constitution of the State are allowed to exercise the elective franchise." *Id*. at 29. As the government observes, Cooley goes on to note that "[c]ertain classes have been almost universally excluded" from this group, including "the idiot, the lunatic, and the felon, on obvious grounds." Resp., ECF 100 at 14 (quoting Cooley at 29). Accordingly, felons have historically been excluded from "political rights" such as the right to vote, the right to hold public office, and the right to serve on juries. *Id*.

The government then contends that "the right to bear arms" was historically situated among these "political rights" belonging not to the citizenry generally but only to the polity of "First-Class Citizens." *Id*. (quoting A. Amar, The Bill of Rights: Creation and Reconstruction 48 (1998)).[7] The trouble with the

---

[7] The government's citation reads, "Akhil Reed Amar, The Bill of Rights 48, 48 * (1998)," which I assume is intended as a reference to page 48 the work identified above. There, Professor Amar writes:

> To see the connection between arms and populism from another angle, consider the key nineteenth-century distinction between political rights and civil rights. The former were rights of members of the polity—call them First-Class Citizens—whereas the latter belonged to all (free) members of the larger society. Alien men and single white women circa 1800 typically could speak, print, worship, enter into contracts, hold personal

government's argument is that while it accurately reflects Professor Amar's view that "the right to bear arms had long been viewed as a political right," it conflicts with the Supreme Court's holding in *Heller* that the Second Amendment confers an "individual right to possess and carry weapons." 554 U.S. at 592. Indeed, *Heller* expressly distinguished the right created by the Second Amendment from "collective" rights or rights that "may be exercised only through participation in some corporate body" and likened it instead to the individual rights enshrined in the First Amendment's Assembly-and-Petition Clause and in the Fourth Amendment's Search-and-Seizure Clause. 554 U.S. at 579. Accordingly, whatever the merits of Professor Amar's interpretation, lower courts are bound by *Heller* to construe the right to bear arms as an individual right rather than a "political right."

With this perspective in mind, I conclude that the better interpretation of "the people" is one that harmonizes its meaning with how it is construed in the context of the First and Fourth Amendments. As my colleague Judge Chang has explained:

property in their own name, sue and be sued, and exercise sundry other civil rights, but typically could not vote, hold public office, or serve on juries. These last three were political rights, reserved for First-Class Citizens. *So too, the right to bear arms had long been viewed as a political right, a right of First-Class Citizens*. (Emphasis added)

> [T]he Fourth Amendment protects the right of the "people" to be secure in their persons, houses, and property. U.S. Const. amend. IV. Yet felons are not categorically removed from Fourth Amendment protection. The most that can be said is that in some settings—not categorically—felons enjoy no or reduced Fourth Amendment protection. Prisoners have no Fourth Amendment right as to prison-cell searches, *Hudson v. Palmer*, 468 U.S. 517, 526 (1984), and that would apply to misdemeanants in prison too. Parolees may be subject to suspicionless searches without the government running afoul of the Fourth Amendment. *Samson v. California*, 547 U.S. 843, 857 (2006). But there simply is no categorical removal of felons from Fourth Amendment protection. The same goes for the First Amendment right of the "people" to peaceably assemble. U.S. Const. amend. I.

*Agee*, 2023 WL 6443924, at *5 (N.D. Ill. Oct. 3, 2023). *But see Hardy*, 2023 WL 6795591, at *4 (concluding that "the people" of the Second Amendment excludes felons, reasoning that "a consistent reading of 'the people' is in tension with the reality that people lose certain constitutional rights when they are convicted of a felony. As the government points out, felons forfeit a number of rights that belong to "the people," including the rights to serve on a jury, to hold office, and to vote."). While the issue is certainly debatable, I am persuaded that when the Seventh Circuit reaches the question (as it inevitably will, *see Atkinson* 70 F.4th at 1023, 1025), it will likely hold that firearm possession by felons is not categorically excluded from the textual scope of the Second Amendment.

But this conclusion does not avail Mr. Jackson because the government's historical evidence amply establishes Congress's

authority to prohibit felons like him from possessing firearms. As it has in other cases, the government points to "firearms laws that banned certain groups of potential non-law-abiders from possessing firearms," as well as "more general laws that authorized capital punishment and estate forfeiture for felony sentences." *Agee*, 2023 WL 6443924, at *7; *see also Jackson*, 69 F. 4th at 502-503 (discussing government's evidence of early laws restricting firearms possession by groups deemed dangerous or a threat "to an orderly society and compliance with its legal norms" and laws imposing "death or forfeiture of a perpetrator's entire estate" for even non-violent offenses); *United States v. Johnson*, No. 23 CR 156, 2023 WL 6276562, at *3 (N.D. Ill. Sept. 26, 2023) (same).

Mr. Jackson understandably bristles at the government's reliance on early American laws such as those that disarmed enslaved persons for the purpose of ensuring that they remained subject to their masters' control. Indeed, as several of the courts that have considered such laws in this context have been quick to underscore, many of the categorical restrictions in the historical record would not survive constitutional scrutiny today. *See*, e.g., *Jackson,* 69 F.4th at 503 ("some of these categorical prohibitions of course would be impermissible today under other constitutional provisions"); *Range* 69 F.4th 122 (Krause, J., dissenting) ("[t]oday, we emphatically reject these bigoted and

unconstitutional laws, as well as their premise that one's race or religion correlates with disrespect for the law"); *Agee*, 2023 WL 6443924, at *8 (restrictions targeting Native Americans and enslaved Black people "would, of course, be unconstitutional today (and are and were shameful)"). There is no question that an analysis that relies on laws grounded in race-based prejudice or similarly deplorable stereotypes is intuitively uncomfortable. But *Bruen* directs courts to examine historical analogues to determine the "historical understanding of the right to keep and bear arms," *Jackson*, 69 F.4th 503, and laws disarming enslaved people, religious minorities, and Native Americans—however repulsive to modern sensibilities—fit that bill. In the taxonomy of historical firearms regulations, all such laws fall broadly within the category of "who" restrictions, *see Atkinson*, 70 F. 4th at 1034 (Wood, J., dissenting) (identifying "six distinct areas of regulation" that have "existed throughout American history"). And the early laws to which the government points show that "[b]y the time of the Second Amendment's ratification in 1791, there already was a historical tradition of legislatures disarming persons based on the perception (sometimes odious perceptions) that certain groups could not be trusted to abide the law or sovereign." *Agee*, 2023 WL 6443924, at *7. *See also Jackson*, 69 F. 4th at 504 (concluding based on similar evidence that legislatures were historically empowered to prohibit firearms possession by

20

"categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed.").

At all events, the government's historical evidence includes analogous laws that do not bear the stain of racial or religious bigotry. Indeed, "the colonies also repeatedly disarmed full-fledged members of the political community as it then existed—i.e., free, Christian, white men—whom the authorities believed could not be trusted to obey the law." *Range* 69 F.4th at 122 (Krause, J., dissenting) (citing Nicholas J. Johnson et al., Firearms Law and the Second Amendment: Regulation, Rights, and Policy 174 (3d ed. 2022)). The government also points to a colonial law disarming the followers of Anne Hutchison, a Boston preacher whose unorthodox beliefs "challenged the Massachusetts Bay government's authority over spiritual matters." *Id.* at 123 (citing Edmund S. Morgan, The Case Against Anne Hutchinson, 10 New Eng. Q. 635, 637-38, 644, 648 (1937), among other sources). Hutchison's followers were disarmed "not because those supporters had demonstrated a propensity for violence," but rather "to embarrass and shame them...because the authorities concluded their conduct evinced a willingness to disobey the law." *Id*. *See also United States v. Reggie Johnson*, No. 18 CR 00458, 2023 WL 6690388, at *7 (N.D. Ill. Oct. 12, 2023); *United States v. Agee*, No. 1:21-CR-00350-1, 2023 WL 6443924, at *9 (N.D. Ill. Oct. 3, 2023). Laws such as these show that while some early English and American

firearms restrictions were undoubtedly premised on biases that today would not withstand scrutiny the Fourteenth Amendment, the broader principle that emerges from the historical record is that "since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed." *Atkinson v. Garland*, 70 F.4th 1018, 1035 (7th Cir. 2023) (Wood., J., dissenting). As Judge Wood observes:

> Even under the English Declaration of Rights, no one thought anything of disarming people who were not loyal to the Crown, or who had committed serious crimes (called felonies), or who had abused their gun rights (often by poaching on lands to which they had no right). This history and tradition follows an unbroken line from long before the Constitution was written, through the 17th and 18th centuries up to the present day.

*Id*. at 1037-38. Indeed, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Gates*, 2023 WL 5748362, at *6 (quoting *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam)). However "mushy" the concept of a virtuous citizenry may be at the margins, *see* Reply, ECF 103 at 16, Mr. Jackson's lengthy history of increasingly serious criminal conduct places him firmly outside of it.

Mr. Jackson faults the government for "fail[ing] to cite an example of a single historical law that permanently abridged

felons' right to bear arms." Reply, ECF 103 at 12. But the government must point only to a "representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2132, 2133 (original emphases). Moreover, as another court in the Seventh Circuit has observed, "[m]odern laws prohibiting felons from possessing firearms are analogous but far more reasonable and just than the early English and revolutionary period laws that prohibited religious minorities or Native Americans from doing so." *United States v. Watson*, No. 23-CR-109, 2023 WL 6623774, at *5 (E.D. Wis. Oct. 11, 2023) (upholding § 922(g)(1) as applied to a defendant previously convicted of drug offenses). Indeed, an important distinguishing feature of § 922(g)(1) as compared to many of its historical antecedents is that the class of persons it applies to is defined not by immutable characteristics such as race or national origin, nor by religious beliefs or association, political opinion, or externally-imposed (and inhumane) characteristics such as enslavement. Rather, it applies to a group defined by the *conduct* of its members, targeting "individuals who have willfully chosen to commit 'the most serious category of crime deemed by the legislature to reflect grave misjudgment and maladjustment.'" *Id*. at *6. (quoting *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)). This is a virtue of the statute, not a vice; to strike it down because it fails to mirror the abhorrent

23

classifications of some Eighteenth- and Nineteenth-century firearms regulations would be a perverse outcome indeed.

Moreover, contrary to Mr. Jackson's argument, the absence of legislation banning firearm possession by felons does not show that Founding- or Reconstruction-era Americans understood felons to have a right to bear arms. To the contrary, the absence of felon dispossession laws can just as easily be understood to reflect that the public did not consider felons to fall within the Second Amendment's protections in the first instance. As the D.C. Circuit observed in *Medina*, at the time of the Founding, a felony was understood as "an offense which occasions a total forfeiture of either lands, or goods, or both, at the common law, and to which capital or other punishment may be superadded," *Medina*, 913 F.3d at 158 (quoting 4 William Blackstone, Commentaries on the Laws of England (Harper ed. 1854)). It may be that "today, felonies include a wide swath of crimes, some of which seem minor," *Range*, 69 F.4th at 102; but our task under *Bruen* is to interpret the rights guaranteed by the Second Amendment through the eyes of the Framers. "With this perspective, it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.

Nor am I persuaded by Mr. Jackson's argument that § 922(g)(1) is unconstitutional as applied to him because it places a greater

burden on his Second Amendment rights than comparable English and early American firearms regulations. For instance, he argues that while § 922(g)(1) bans him permanently from firearms possession, "the Hutchinson affair demonstrates that 'supporters who confessed their sins were welcomed back into the community and able to retain their arms.'" Reply, ECF 103 at 24 (quoting Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 Wyo. L. Rev. 249, 263 (2020)). But even assuming that "actual practices at the time of the founding show that "once wrongdoers had paid their debts to society, the colonists forgave them and welcomed them back into the fold,'" Reply, ECF 103 at 29 (quoting *Folajtar* v. Att'y Gen., 980 F.3d 897, 923 (3d Cir. 2020) (Bibas, J., dissenting) (citing scholarly evidence), that observation does not advance Mr. Jackson's cause because that is not the situation in which he finds himself. Mr. Jackson committed the instant § 922(g)(1) violation while on supervised release after a previous period of incarceration. *See* Presentencing Investigation Report, Government's Memorandum, ECF 91 at 47. Indeed, his history of recidivism over more than a decade and the increasing severity of his offenses are the hallmarks of recalcitrance, not repentance.[8]

---

[8] As the Probation Office notes, "defendant has been sentenced to probation and several terms of custody in C.C.D.O.C and I.D.O.C., yet nothing has seemed to deter him. The defendant's behavior

Accordingly, even assuming that English and early American governments did not, in practice, enforce permanent firearms restrictions against individuals who demonstrated that they were no longer dangerous or untrustworthy, that does not support Mr. Jackson's claim that § 922(g)(1) is unconstitutional as applied to him.

IV.

For the reasons discussed above, Mr. Jackson's motion to vacate his guilty plea and dismiss the indictment is denied.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: October 31, 2023

---

continues to escalate in the instant offense." Sentencing Recommendation, ECF 92 at 2.